# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs March 3, 2015

## STATE OF TENNESSEE v. CLINTON AUSTIN

**Appeal from the Criminal Court for Shelby County**
**No. 11-04214    Glenn Wright, Judge**

_____

**No.  W2014-01211-CCA-R3-CD  - Filed May 12, 2015**
_____

The Defendant, Clinton Austin, was found guilty by a Shelby County Criminal Court jury of aggravated sexual battery, a Class B felony. *See* T.C.A. § 39-13-504 (2014).  The trial court sentenced the Defendant to ten years' confinement at 100% service as a violent offender.  On appeal, he contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred by admitting the video recording of the victim's forensic interview.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Stephen C. Bush, District Public Defender, and Tony N. Brayton (on appeal) and Trent Hall (at trial), Assistant Public Defenders, for the appellant, Clinton Austin.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Terre Fratesi, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In this case, the Defendant was indicted for rape of a child.  The victim, D.J.,[1] was seven years old at the time of the incident, and the Defendant was related to D.J.'s stepgrandfather.

---

[1]   It is this court's policy to refer to minors and victims of sexual assault by their initials.

**Pretrial Hearing**

After D.J. disclosed the alleged sexual contact, she underwent a medical examination and a forensic interview at the Memphis Child Advocacy Center (Center). Less than one month before the trial, the State filed a motion requesting the trial court determine the admissibility of the video-recorded forensic interview pursuant to Tennessee Code Annotated section 24-7-123 (Supp. 2014).

At the motion hearing, Vanessa Roberts, Team Services Director for the Center, testified that she facilitated the Child Protection Investigative Team comprised of the district attorney's office, Shelby County law enforcement agencies, and the Tennessee Department of Children's Services (DCS). She said that the Center was included in the investigative team and that the Center conducted forensic interviews, provided counseling services, and conducted assessments of abuse victims and their service needs. The Center's services were available to sexual abuse and severe physical abuse victims.

Ms. Roberts testified that she was familiar with Tennessee Code Annotated section 9-4-213 regarding the statutory requirements for child advocacy centers and that she had previously testified in other hearings regarding the Center's status as a nonprofit organization. She said the Center employed an executive director who answered to a board of directors. She identified the Center's street address. Relative to the Center's location and layout, she stated that the building was child friendly and had a waiting area and interview rooms designed as playrooms. She said the waiting and interview rooms were separated from the staff's work areas and noted the child-friendly areas had child-size furniture and child-appropriate decor and colors.

Ms. Roberts testified that the Center followed policies and procedures, which complied with the national network of children's advocacy centers guidelines. She said the Center maintained data relative to the types of cases it investigated by victim age, gender, and race, type of abuse, and the services provided by the Center. She said the Center was required to compile this data in order to maintain its nonprofit status, which was obtained before 1998.

Ms. Roberts testified that the Center employed three forensic interviewers, including Teresa Onry, who conducted the victim's interview. Ms. Roberts stated that Ms. Onry had been a forensic interviewer at the Center since 2008 but previously worked as a case manager for DCS. Ms. Onry possessed a degree from Tennessee State University in a field related to social services education, psychology, or similar field of study. Ms. Roberts said the forensic interviewers engaged in peer review, which was supervised by Pat Lewis. Relative to Ms. Onry, Ms. Roberts confirmed that she had completed forty hours of training before she began

working as an interviewer and maintained eight hours of supervision. Ms. Onry did not have a criminal history, and Ms. Roberts said Ms. Onry would not have been permitted to work at the Center with a criminal history. Ms. Roberts stated that forensic interviewers at the Center followed a national protocol called RATAC and that the protocol was in effect at the time of D.J.'s interview.

Ms. Roberts testified that the interview rooms were equipped with close-circuit cameras viewable from another location and that nobody was permitted inside the interview room during an interview other than the child and the interviewer. The equipment was maintained to ensure proper working condition.

Trial counsel told the trial court that he had followed the statutory requirements for admission of a video-recorded forensic interview step-by-step during the prosecutor's direct examination of Ms. Roberts and that "all ha[d] been covered." Counsel had no questions for Ms. Roberts. Upon examination by the trial court, Ms. Roberts testified that Ms. Onry had completed a minimum of forty hours of forensic training in traumatized children and eight hours of interviewing children under the supervision of a qualified forensic interviewer.

D.J. testified that she was born on June 7, 2003, and that she was age ten and in the fifth grade. She said that before the hearing, she watched a video recording of her conversation with Ms. Onry. She said that she watched the entire recording and that she recalled talking to Ms. Onry a long time ago. She said that she told Ms. Onry the truth and that she and Ms. Onry were the only people in the room during the interview. She said they discussed someone's touching her and recalled using dolls and drawings to show Ms. Onry where she was touched. She agreed the prosecutor asked her to initial the compact disc of the recording after she viewed it, and she identified her initials on the disc. D.J. understood she would testify at the trial about the incident.

On cross-examination, D.J. testified that Ms. Onry told her their conversation was being recorded and indicated where the camera was located. She confirmed that she and Ms. Onry were the only people present during the interview.

Upon this proof, trial counsel objected to the admission of the recording at the trial on confrontation grounds and noted the victim was not subject to cross-examination when the incident was "fresh on her memory." After viewing the recording and considering the victim's age and maturity, the timing of the statement, the duration of the alleged abuse, the details provided by the victim, the manner in which the interview was conducted, and the relationship of the victim and the Defendant, the trial court found the recording trustworthy and permitted the State to introduce it at the trial.

**Trial Proceedings**

At the trial, the victim's mother testified that D.J. was born on June 7, 2003, and that D.J. was seven years old in February 2011. She said that on February 12, 2011, she went to work and that D.J. and the victim's brother stayed with their grandmother. The victim's grandmother and uncle were at the home when the victim's mother dropped them off before work. The victim's mother had known the Defendant for about twelve years because he was related to her stepfather, although she did not know the relationship. The victim's mother said the Defendant came to the victim's grandmother and stepgrandfather's home almost every other day in February 2011. Although she did not know the Defendant well, she said he was friendly, respectful, and interacted well with her children. She said that she did not know the Defendant was going to be at the home on February 12 but that this did not cause her to have concerns.

The victim's mother testified that after she left work, she went to her mother's home to pick up her children on February 12, 2011. Her stepfather, her brother, the Defendant, and her children were there, although she did not see D.J. Her mother was not home. The victim's mother entered the home, called out for D.J., and looked for D.J throughout the house. She saw the Defendant leaving the bathroom and noticed he "pulled the door shut and was fixing his pants, fidgeting with his pants." She thought the Defendant's conduct was unusual because he should have "done that" while inside the bathroom. She noticed the Defendant turned off the bathroom light. She overheard the Defendant tell her stepfather that he was going to walk to the store. She did not recall if she and the Defendant made eye contact or if the Defendant spoke to her. She recalled, though, that the Defendant did not mention D.J.'s whereabouts.

The victim's mother testified that she walked to her brother's bedroom, that she sat down, and that she saw D.J. leaving the bathroom. She noticed D.J. was pulling and "fixing her pants." The victim's mother said that she watched the bathroom door after the Defendant walked out and that she saw the bathroom door from her brother's bedroom. She did not see D.J. enter the bathroom, which was small, only had one entrance, and was the only bathroom in the home. The victim's mother called for D.J. from the bedroom. She asked D.J. if the Defendant was in the bathroom with her, and D.J. said yes. Upon questioning, D.J. also told her that the Defendant touched her.

The victim's mother testified that D.J. spoke to her in a low voice, initially did not want to talk about the Defendant, and was scared because she thought she was in trouble. The victim's mother became angry and told one of her family members to "get a gun," although nobody in the home had a gun. She said that when the Defendant returned from the store about fifteen minutes later, she confronted him. The Defendant denied touching D.J.,

-4-

and she told the Defendant that she saw him leave the bathroom. The Defendant denied being in the bathroom and seeing anyone in there. The victim's mother called the police and took D.J. to the hospital for an examination.

The victim's mother testified that D.J. underwent a forensic interview at the Center. Although the victim's mother was not allowed to be present for the interview, she observed from an adjacent room. She said D.J. did not want to participate in the interview. She said D.J. had been consistent about the Defendant's touching her.

On cross-examination, the victim's mother testified that the forensic interview occurred a few days after the Defendant's arrest, although she did not recall the number of days. She agreed she and D.J. had discussed the incident once or twice since the Defendant's arrest. She said she did not suspect the Defendant was capable of something like this before February 2011.

D.J. testified that she was age ten and in the fifth grade at the time of the trial. D.J. identified several family members and the location of her grandmother and stepgrandfather's home. She spent a lot of time at her grandmother's home, and she recalled two times when the Defendant was there.

D.J. testified that on the last day the Defendant was at her grandmother's home, she was in the bathroom with the Defendant when her mother returned to pick her up. She had used the bathroom, and the Defendant entered the bathroom and closed the door. She said the Defendant sat on the toilet after he "unzipped" his clothes. She said that she attempted to leave the bathroom but that the Defendant placed his hands around her waist and pulled her toward him. She said that the Defendant placed her on his lap, that she and the Defendant faced each other, that her legs were open, and that he removed her clothes. The bathroom light remained on during the incident. She said that she saw the Defendant's penis, which she referred to as his "thing," and felt it on her private area, which she referred to as her "thing," when he placed her on his lap. She said the Defendant's penis was erect but did not touch the inside of her private area. She denied the Defendant attempted to insert his penis in her private area. She said that the Defendant did not talk during the incident but that he touched her neck with his lips. She told the Defendant to stop, but he did not say anything and continued to touch her private area with his penis.

D.J. testified that the Defendant stopped touching her about the time her mother arrived, although she did not realize her mother had arrived. She said she and the Defendant stood up, and the Defendant walked out of the bathroom as he zipped his pants. D.J. remained in the bathroom after the Defendant left, and she did not hear the Defendant speak to anyone after he left. D.J. learned her mother was home when she left the bathroom and

saw her mother in her uncle's bedroom. She walked to her mother and told her what happened.

D.J. testified that the Defendant also touched her private area with his hand. She told her mother that the Defendant placed his hands down her pants and between her legs. She felt more than one of the Defendant's fingers between her legs and on her private area but denied the Defendant inserted his fingers in her private area. She said the Defendant's touching her with his fingers occurred before he touched her with his penis.

D.J. testified that the Defendant's touching her made her nervous and unsure what to do or say. She denied, though, that she was scared to tell her mother. She recalled the medical examination and the forensic interview and said her mother was not in the room when she was interviewed. She agreed that during the interview, she used dolls to demonstrate what the Defendant did to her. She identified the compact disc of the recording and her initials previously written on it, which was received as an exhibit, and said she had watched the recording.

On cross-examination, D.J. testified that after the Defendant left the bathroom, she remained there with the door closed. She clarified that she was in the bathroom when she heard her mother calling her name. She did not recall what the Defendant wore that day. She denied discussing the incident with her family after February 12, 2011. She said she was present when the Defendant was arrested and agreed she was examined at the hospital that night. She said the forensic interview occurred the following day.

On redirect examination, D.J. demonstrated for the jury how the Defendant touched her, but she was unsure if the Defendant inserted his penis into her private area. She said, though, that it did not feel as though the Defendant attempted penetration.

Memphis Police Sergeant Jay Dorning, the lead investigator, testified that he responded to the hospital and spoke with D.J. and her mother. He said D.J. confirmed that she was touched between her legs, and her mother provided an audio-recorded statement. The rape kit was collected and submitted to the Tennessee Bureau of Investigation (TBI) for analysis, but no DNA was detected.

Sergeant Dorning testified that he questioned the Defendant and collected a sample of his DNA. He observed the victim's forensic interview by teleconference. He said D.J. consistently claimed the Defendant touched "inside her thing" with his "thing." On cross-examination, he testified that he spoke to the Defendant after the arrest.

The parties stipulated that the TBI analysis of the victim's vaginal and anal swabs from the rape kit and her underwear failed to show the presence of semen or saliva.

Dr. Karen Lakin, an expert in pediatrics and child maltreatment, testified that she had reviewed the report and photographs from D.J.'s medical examination. She said D.J. reported that the Defendant "came into the restroom" when she was at her grandmother's home, that "he . . . unzipped his pants and put his privates between her legs and . . . took off her pants and underwear," and that "he kissed her on the left neck." Dr. Lakin said that no cuts, abrasions, or trauma were found on D.J.'s vaginal area but that this finding did not exclude sexual assault. Dr. Lakin said there were many situations in which genital- to-genital contact did not cause injury. She noted that the majority of pediatric cases did not result in physical injury, tearing, or bruising to the vaginal area.

Dr. Lakin testified that she could not exclude or confirm whether a sexual assault occurred based on the medical examination. She said, though, in fondling cases, she did not expect to find physical evidence of sexual contact.

On cross-examination, Dr. Lakin testified that nurse Donna Clarron performed the examination, that Ms. Clarron was no longer employed at the hospital, and that she supervised Ms. Clarron during her employment. She said D.J. was not hospitalized after the examination and agreed the examination occurred on the day of the incident. She agreed the examination was not highly suggestive or supportive of sexual assault. She agreed the examination showed "everything physical was within normal limits."

Teresa Onry, a forensic interviewer at the Center, testified that she conducted D.J.'s forensic interview on February 15, 2011. During the interview, Ms. Onry and D.J. were the only people in the room, although other personnel were permitted to observe from an adjacent room or by teleconference. She said D.J. made an active disclosure of sexual contact, meaning that she disclosed what happened immediately or near the time of the incident. She said D.J. used anatomical dolls to describe the contact, used age-appropriate terminology, and was calm and friendly. The recording of the interview was played for the jury.

In the recording, D.J. stated that she was seven years old and in the second grade. She discussed various aspects of school and said she had good grades. She helped Ms. Onry draw a picture of D.J.'s face. They discussed her family, and D.J. identified her mother, father, uncle, grandmother and her husband, cousin, and brother. Ms. Onry showed D.J. anatomical drawings of the male and female bodies. Relative to the female drawing, D.J. identified the eyes, belly button, and toes and referred to the breasts and vaginal areas as

"things" and to the buttocks as "buns." Relative to the male drawing, she identified the ears, hands, and knees and referred to the penis as "thing" and to the buttocks as "buns."

D.J. stated she received hugs and kisses from the family members she previously identified and said she liked their hugs and kisses. She said it was not okay to be touched in some areas of the body and pointed to the breasts and vaginal area on the anatomical drawing. She said the Defendant touched her, and she said he was her grandmother's husband's friend. D.J. said the Defendant went to jail because he put his hands on her "body parts," which included her breasts, vaginal area, and buttocks.

Regarding the relevant events, D.J. stated that she went to use the bathroom, that she closed the bathroom door but did not lock it, and that she used the toilet. She said that as she pulled up her pants, the Defendant entered the bathroom and unzipped his pants without speaking. She did not say anything to him. She said he put his thing on her thing on the inside while she was sitting.

D.J. stated that she saw the Defendant's thing when he put it inside her thing. She said that the Defendant sat on the toilet and that she sat on his lap when he put his thing inside her thing. D.J. stated that after the Defendant put his thing inside her thing, he touched her vaginal area and buttocks with his hands. She said the Defendant's hands went inside her thing after he pulled down her underwear. D.J. used dolls to demonstrate that she faced the Defendant while sitting on his lap. She said he positioned her on his lap. She said he unzipped his pants but kept on his underwear and pulled his thing through his underwear. She said the Defendant pulled down her pants and underwear.

D.J. stated that the Defendant stood up and held her up after the incident. She said he turned off the light and pulled up his pants as he left the bathroom. She said she turned on the light to put on her pants. She said her mother saw the Defendant walk out of the bathroom and zip his pants. She said that her mother did not know she was in the bathroom and that her mother spoke to the Defendant, but D.J. did not know about what. She denied that other incidents occurred.

D.J. stated she told her mother what happened immediately. She said her mother sent her cousin to obtain a gun and called D.J.'s aunt. She said her mother spoke to the Defendant, but she did not recall what was said. She denied anyone else had touched her.

D.J. stated her stepgrandfather, her cousin, and the Defendant were the only people home at the time of the incident. She said that before the incident, the Defendant cut his hand while peeling potatoes and that she gave him tissue for the blood. She said the Defendant was African-American, tall, and skinny. She said that when the Defendant walked

into the bathroom, he turned off the light and unzipped his pants as she pulled up her pants. She said that he placed her on his lap and that after he stood up, he held her. She said the Defendant told her mother that he had not been in the bathroom with her.

Upon this evidence, the Defendant was convicted of aggravated sexual battery. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction for aggravated sexual battery. He argues "there were no witnesses to the alleged assault," that no physical evidence showed the victim was assaulted by anyone, and that the recording of the forensic interview should have been excluded. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). Sexual contact, in relevant part, is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or

gratification[.]" *Id*. § 39-13-501(6) (2010) (amended 2013). Intimate parts are "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id*. at (2).

In the light most favorable to the State, the record reflects the victim, who was seven years old at the time of the incident, testified that after she used the toilet, the Defendant entered the bathroom and closed the door. The Defendant unzipped his pants and sat on the toilet. Although the victim attempted to leave the bathroom, the Defendant grabbed her and placed her on his lap. The victim said that she and the Defendant faced each other and that her legs were open after the Defendant removed her clothes. While the victim was on the Defendant's lap, she felt the Defendant's penis on her private area. The victim denied the Defendant attempted to insert his penis inside her private area. The victim's testimony at the trial provided sufficient evidence to support the Defendant's conviction for aggravated sexual battery. The Defendant's assertion that no witnesses existed to the sexual contact is without merit. *See State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (concluding that a child victim's testimony can be sufficient to support a conviction for child rape).

Furthermore, the victim's mother provided corroborating evidence that the Defendant and the victim were in the bathroom together. The victim's mother witnessed the Defendant's leaving the bathroom and zipping his pants when she arrived to pick up the victim. Although the victim's mother did not see the victim leave the bathroom immediately, she watched the sole bathroom door from the time she entered the home until the victim left the bathroom after the Defendant. Upon seeing the victim leave the bathroom, the victim's mother immediately questioned the victim about whether the Defendant was in the bathroom with her, and the victim disclosed the sexual contact.

Relative to the victim's medical examination, the record reflects that no DNA, semen, or saliva were detected on the swabs from the medical examination and the victim's underwear. Likewise, no cuts, abrasions, or trauma were found on the victim's vaginal area, and the examination showed the victim's physical condition was within normal limits. Dr. Lakin, though, was unable to exclude the possibility that a sexual assault occurred. As a result, the jury could have reasonably concluded that the Defendant committed an aggravated sexual battery.[2]

---

[2] We note that this court has previously determined that aggravated sexual battery is not a lesser included offense of rape of a child. *See State v. John J. Ortega, Jr.*, No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *11 (Tenn. Crim. App. Apr. 23, 2015) (stating that aggravated sexual battery is not a lesser included offense of rape of a child pursuant to Tennessee Code Annotated section 40-18-110); *see also State v. Dallas Jay Stewart*, No. M2011-01994-CCA-R3-CD, 2013 WL 3820992, at *37 (Tenn. Crim. App. July 22, 2012) (stating that aggravated sexual battery is not a
(continued...)

The jury's verdict reflects that it credited the testimony of the victim, the victim's mother, and Dr. Lakin. As a result, we conclude that the evidence is sufficient to support the Defendant's conviction. He is not entitled to relief on this basis.

**II**

**Admissibility of the Video-Recorded Forensic Interview**

The Defendant contends that although the requirements of Tennessee Code Annotated section 24-7-123 were satisfied, admission of the video-recorded forensic interview violated his confrontation rights. He also argues that the recording was inadmissible hearsay. The State responds the recording was properly admitted pursuant to Code section 24-7-123.

Tennessee Code Annotated section 24-7-123(a)-(b) states, in relevant part,

(a) Notwithstanding any provision of this part to the contrary, a video recording of an interview of a child by a forensic interviewer containing a statement made by the child under thirteen (13) years of age describing any act of sexual contact performed with or on the child by another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at the trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

(b) A video recording may be admitted as provided in subsection (a) if:

(1) The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination;

---

[2](...continued)
lesser included offense of rape of a child for double jeopardy purposes). However, in the present case, the Defendant specifically requested a jury instruction relative to aggravated sexual battery as a lesser included offense of rape of a child, and the request served as an amendment to the indictment. *See Demonbreun v. Bell*, 226 S.W.3d 321, 324 (Tenn. 2007) (stating "an affirmative action by the defendant seeking a jury instruction on an uncharged offense has been held to constitute consent to an effective amendment of the indictment"); *see also State v. Davenport*, 980 S.W.2d 407, 409 (Tenn. Crim. App. 1998) (stating "that where the defendant affirmatively requests a particular jury instruction on an offense not charged in the indictment . . . the defendant is deemed to have consented to an amendment of the indictment").

(2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pre-trial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:

(A) The mental and physical age and maturity of the child;

(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;

(C) The timing of the child's statement;

(D) The nature and duration of the alleged abuse;

(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;

(F) Whether the statement is spontaneous or directly responsive to questions;

(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;

(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(I) The relationship of the child to the offender;

(J) Whether the equipment that was used . . . was capable of making an accurate recording; and

(K) Any other factor deemed appropriate by the court;

(3) The interview was conducted by a forensic interviewer who met the following qualifications at the time the video recording was made, as determined by the court:

(A) Was employed by a child advocacy center that meets the requirements of § 9-4-213(a) or (b);

(B) Had graduated from an accredited college or university with a bachelor's degree in a field related to social service, education, criminal justice, nursing, psychology or other similar profession;

(C) Had experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas:

(i) Child protective services;

(ii) Criminal justice;

(iii) Clinical evaluation;

(iv) Counseling; or

(v) Forensic interviewing or other comparable work with children;

(D) Had completed a minimum of forty (40) hours of forensic training in interviewing traumatized children and fifteen (15) hours of continuing education annually;

(E) Had completed a minimum of eight (8) hours of interviewing under the supervision of a qualified forensic interviewer of children;

(F) Had knowledge of child development through coursework, professional training or experience;

(G) Had no criminal history as determined through a criminal records background check; and

(H) Had actively participated in peer review;

(4) The recording is both visual and oral and is recorded on film . . . or by other similar audio-visual means;

(5) The entire interview of the child was recorded on the video recording and the video recording is unaltered and accurately reflects the interview of the child; and

(6) Every voice heard on the video recording is properly identified as determined by the court.

The Confrontation Clause provides a criminal defendant the rights to confront and cross-examine witnesses. *See* U.S. Const. Amends. VI, XIV; Tenn. Const. art. 1, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court concluded that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity to cross-examin[e]" witnesses who do not appear at a trial. A hearsay statement is testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Id*. at 51-52 (internal quotation marks and citation omitted). In order for a testimonial statement to be admissible, the declarant must be unavailable to testify, and the defendant must have had a prior opportunity to cross-examine the declarant. *Id*. at 53-55. However, if the declarant is available to testify and is subject to cross-examination, "the Confrontation Clause places no constraints at all on the use of . . . testimonial statements." *Id*. at 59 n.9.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence *or otherwise by law*. *Id*. at 802 (emphasis added). "Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted[.]" *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972); *Johnson v. State*, 596 S.W.2d 97 (Tenn. Crim. App. 1979)).

Relative to the Defendant's confrontation rights, our supreme court has recently concluded that a video-recorded forensic interview conducted pursuant to Code section 24-7-123 is testimonial under *Crawford* because the statements made by a victim to a forensic interviewer are contemplated to be used at a trial to establish sexual contact with the victim. *State v. Barry D. McCoy*, — S.W.3d —, —, No. M2013-00912-SC-R11-CD, 2014 WL 6725695, at *12 (Tenn. Dec. 1, 2014). However, the court concluded that Code section 24-7-123 does not permit the admission of the recording when the victim is unavailable because the statute requires the victim "to authenticate the video recording *before* it is submitted, and to be available for cross-examination *at trial*." *Id*. (emphasis in original). As a result, the court concluded that Code section 24-7-123 and the Confrontation Clause require the victim

-14-

"first authenticate[] the video recording and then appear[] for cross-examination at trial to defend or explain the prior recorded statements." *Id.*; *see State v. Marvin Davis*, No. W2013-00656-CCA-R3-CD, 2014 WL 1775529, at *6 (Tenn. Crim. App. May 1, 2014) (stating the Confrontation Clause "is not violated by the admission of a video recording of the forensic interview when the child testifies at trial and is subject to cross-examination by the defendant").

Although the Defendant cites *State v. Pilkey*, 776 S.W.2d 943 (Tenn. 1989), and *State v. Deuter*, 839 S.W.2d 391 (Tenn. 1992), to support his contention that admission of the video-recorded forensic interview violated his confrontation rights, his reliance on these cases is misplaced. Not only were these cases decided before *Crawford*, our supreme court stated in *Barry D. McCoy* that *Pilkey* and *Deuter* "considered Confrontation Clause challenges to a statute which preceded the enactment of section 24-7-123." *Barry D. McCoy*, — S.W.3d at —, 2014 WL 6725695, at *13 (citing *Deuter*, 839 S.W.2d at 392; *Pilkey*, 776 S.W.2d at 943-44). The court explained that the statute at issue in *Pilkey* "did not allow for proper cross-examination of the child witness because it 'forced [a defendant] to call the child, if desired, as a witness for *direct examination*.'" *Id.* (quoting *Pilkey*, 776 S.W.2d at 948) (emphasis in original). In *Deuter*, the child victim "could not provide 'information as to when, where, or under what circumstances the acts occurred.'" *Id.* (quoting *Deuter*, 839 S.W.2d at 394). The distinguishing feature between Code section 24-7-123 and *Pilkey* and *Deuter* is the defendant now has "the opportunity for effective cross-examination as required by *Crawford* and its progeny." *Id.*

In the present case, the victim testified at the pretrial hearing as required by Code section 24-7-123(b)(1). She stated that she previously viewed the recording of her conversation with Ms. Onry, that she recalled her conversation with Ms. Onry, and that she told the truth during the interview. She identified a compact disc of the recording and said she previously wrote her initials on it after viewing it in the prosecutor's office. The victim understood she would have to testify at the trial. We note that trial counsel cross-examined the victim at the hearing. Relative to subsection (b)(2), the record reflects that the trial court properly concluded after considering the statutory factors that the recording possessed the appropriate guarantees of trustworthiness.

Relative to subsection (b)(3) regarding the qualifications of the forensic interviewer, Ms. Roberts's testimony reflects that Ms. Onry's qualifications and the Center satisfied the statutory requirements. We conclude that the evidence presented at the pretrial hearing showed that the requirements of Code section 24-7-123 were satisfied because the victim authenticated the recording of the forensic interview and was subject to cross-examination by the Defendant. The victim, likewise, testified at the trial about the authenticity of the recording, which provided the Defendant an opportunity to cross-examine the victim about

the statements in the recording and any inconsistencies. Although the recording was not played for the jury until Ms. Onry testified, nothing prevented the Defendant from cross-examining the victim about the recording. As a result, we conclude that admission of the recording did not violate the Defendant's confrontation rights and that he is not entitled to relief on this basis.

Relative to the Defendant's argument that the recording was inadmissible hearsay, we note that the only objection made at the pretrial hearing and in the motion for a new trial was that the recording violated the Defendant's confrontation rights. He concedes in his brief that he raises the hearsay argument for the first time on appeal. *See* T.R.A.P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . , unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived").

In any event, our supreme court has concluded that Code section 24-7-123 creates "a specific and limited exception to the general rule against the admission of hearsay evidence, and Rule 802 recognizes that sources of law outside . . . the Tennessee Rules of Evidence may develop such an exception." *Barry D. McCoy*, — S.W.3d at —, 2014 WL 6725695, at *7; *see Marvin Davis*, 2014 WL 1775529, at *8-9 (quoting Tenn. R. Evid. 802) (concluding that Code section 24-7-123 does not violate the rule against hearsay and noting that hearsay is inadmissible pursuant to Rule 802 "'except as provided . . . *otherwise by law*'"). The court explained that the statute is a rule of evidence and "does not *require* the admission of video-recorded statements that would otherwise be barred by established law." *Barry D. McCoy*, — S.W.3d at —, 2014 WL 6725695, at *8 (citing T.C.A. § 24-7-123(a), (b) (emphasis in original)). We conclude that the recording was properly admitted. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE